# In re C-A-, Respondent

*Published June 15, 2006*[1]

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)   The members of a particular social group must share a common, immutable characteristic, which may be an innate one, such as sex, color, or kinship ties, or a shared past experience, such as former military leadership or land ownership, but it must be one that members of the group either cannot change, or should not be required to change, because it is fundamental to their individual identities or consciences. *Matter of Acosta*, 19 I&N Dec. 211(BIA 1985), followed.

(2)   The social visibility of the members of a claimed social group is an important consideration in identifying the existence of a "particular social group" for the purpose of determining whether a person qualifies as a refugee.

(3) The group of "former noncriminal drug informants working against the Cali drug cartel" does not have the requisite social visibility to constitute a "particular social group."

FOR RESPONDENT: Michael D. Ray, Esquire, Miami, Florida

FOR THE DEPARTMENT OF HOMELAND SECURITY: Maria M. Lopez-Enriquez, Assistant Chief Counsel

BEFORE:   Board Panel: HOLMES, HURWITZ, and MILLER, Board Members.

HOLMES, Board Member:

The respondents, a married couple and their two minor children, are natives and citizens of Colombia.  In their deportation proceedings, the lead respondent requested asylum and withholding of deportation, claiming fear of persecution in Colombia on account of an imputed political opinion and membership in a particular social group.  On July 31, 1997, an Immigration Judge denied their claims for relief and granted voluntary departure.  In a decision dated March 20, 2002, we affirmed the Immigration Judge's decision.

On appeal, the United States Court of Appeals for the Eleventh Circuit determined that the lead respondent was threatened with harm on account of membership in a group composed of noncriminal informants. *Castillo-Arias*

---

[1]  The August 13, 2004, order in this case, which was affirmed by the United States Court of Appeals for the Eleventh Circuit in *Castillo-Arias v. U.S. Attorney General*, 446 F.3d 1190 (11th Cir. 2006), is published with editorial changes consistent with our designation of the case as a precedent.

*v. U.S. Atty. Gen.* (11th Cir. 2003) (table). The court has remanded the case for us to decide in the first instance whether noncriminal informants are a "particular social group" as that term is used in the definition of a "refugee" in section 101(a)(42)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42)(A) (2000). As discussed below, we find that the group of noncriminal informants is not a "particular social group."

## I. BACKGROUND

### A. Facts

The lead respondent provided the following account of events related to his claim for asylum. He testified that he was born and raised in Cali, Colombia, the headquarters of the Cali drug cartel. He lived with his wife and two children in Cali, where he operated a bakery from 1990 to some time in 1995. During this time, he was an acquaintance of A-D-, a former policeman in the Cali Police Department who, after being fired for corruption, became the chief of security for the Cali cartel. The respondent was also a good friend of V-M-M-, the General Counsel for the city of Cali, who was responsible for investigating and prosecuting drug traffickers in Cali.

Between 1990 and 1994, A-D- would visit the respondent's bakery on weekends and talk openly about his involvement with the Cali cartel. A-D- identified people, places, and events related to the cartel's exportation of narcotics from Colombia to the United States and Europe. A-D- also informed the respondent of his close ties with the Rodriguez brothers and others involved in running the Cali drug cartel. The respondent passed the information he learned from A-D- along to V-M-M-. He told V-M-M- about A-D-'s statements that the Cali cartel had declared war against the Government of Colombia and that they would kill politicians who opposed the cartel. He also told V-M-M- what he had learned from A-D- about the location and size of Cali cartel assets, including banks, bank accounts, mansions, haciendas, villas, and other assets both within and outside of Colombia.

On May 15, 1995, the respondent was with his son, who was riding a bicycle, when a car suddenly blocked their path. Three men with pistols and an automatic weapon attempted to force the respondent into the car. When he resisted he was forced to the ground and beaten. The respondent's son screamed and one of the men hit him in the face with a pistol. The commotion brought people in the neighborhood out of their houses and the men fled in their car. As they departed, they warned the respondent that things would get worse for him and his family and that they would also get V-M-M-. The

respondent took his son to a clinic where he underwent reconstructive surgery to repair his mouth and jaw.

After this attack, the respondents went to the lead respondent's parents' home in the northern section of Cali for the remainder of the month of May 1995. The respondent attempted to rent his bakery while he was away but the lessees were intimidated and some lessees were harmed for failing to disclose the whereabouts of the respondent. V-M-M- advised the respondent to go into hiding and eventually to leave Colombia. The respondent's parents relocated in Cali in attempts to evade persons looking for their son. After the respondent made two trips to the United States in 1995, the respondents entered this country in February 1996 as visitors for pleasure with authorization to remain until August, 8, 1996.

The respondent last spoke to A-D- in early 1995, and he has heard unconfirmed reports that A-D- may have been killed. The Rodriguez brothers, leaders of the Cali cartel, were prosecuted and served time in prison. The respondent did not appear as a witness in the criminal proceedings against members of the Cali cartel. V-M-M- left Colombia for Spain after attempts against his life by the Cali cartel. In April 1997, the respondent's parents and two sisters left Colombia for Germany.

## B.  The Immigration Judge's Decision

The Immigration Judge found the respondent's testimony credible but concluded that he had failed to establish either past persecution or a well-founded fear of persecution on account of a protected ground under the Act. The Immigration Judge reasoned that the assault and threats against the lead respondent were based on retaliation or retribution because of his voluntary decision to provide information to the Colombian Government concerning the operations of the Cali cartel. Finding a lack of the required nexus, the Immigration Judge denied the respondents' applications for asylum and withholding of deportation.

## C.  The Board's Decision

On appeal to the Board, the lead respondent argued that he had suffered past persecution and had a well-founded fear of persecution based on (1) a political opinion imputed by the drug cartel and (2) membership in a particular social group composed of noncriminal informants who had informed against the Cali drug cartel. We rejected the first argument, holding that the people who threatened the respondent did so "out of personal motives and not due to any political opinion imputed to the respondent."

We did not separately address the claim based on membership in a particular social group but stated that we agreed with the Immigration Judge

"that the record contains insufficient evidence that there was any motivation behind the actions of the cartel members against the respondent, other than revenge for the aid he provided to the government." We therefore affirmed the Immigration Judge's decision and dismissed the appeal.[2]

### D. The Eleventh Circuit's Decision.

The Eleventh Circuit found that the evidence of record supported our conclusion that the threats to the respondent were not on account of his political opinion or imputed political opinion. The court found, however, that it was unable to determine on the record before it whether the respondent had been targeted because of his membership in a particular social group.

In addressing the particular social group issue, the court found that "[t]he BIA implicitly acknowledged two possible bases for the action of the cartel members: retribution, and [the respondent's] status as an informant." The court found that the Board erred in concluding, based on the evidence in the record, that the sole motive for the actions against the respondent was revenge for the aid he provided to the Colombian Government. The court stated that "[a]lthough there certainly is evidence to support the BIA's conclusion that revenge was a motive in the action of cartel members, a reasonable fact-finder would be compelled to conclude that [the respondent] has produced evidence from which it is reasonable to believe that the harm was motivated by his membership in a group composed of noncriminal informants."

Having found that the respondents were targeted because of their membership in a group composed of noncriminal informants, the court reversed the Board's finding that the sole motive for harming the respondents was retaliation or retribution. Because we had not addressed whether noncriminal informants constitute a "particular social group" within the meaning of the Act, the court has now remanded that question for our consideration.

---

[2]  With his appeal brief the respondent submitted documents marked Exhibits A and B in support of his argument that internal relocation was not an option. The Exhibit A documents concerned the respondent's brother-in-law, a civic leader who worked against the Cali cartel and who was shot in November 1998 after returning from a government meeting. The Exhibit B document concerned threats to the surviving spouse of the respondent's brother-in-law. We did not reach the issue of internal relocation in our prior decision and therefore did not address the additional evidence submitted with the appeal. Nor do we now find that the information contained in these Exhibits would affect the resolution of the particular social group issue, which we have been directed to address on remand.

## II.  ANALYSIS

### A.  *Matter of Acosta* Formulation

The starting point in defining the phrase "particular social group" is set forth in *Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985).  There we explained that "persecution on account of membership in a particular social group" refers to

> persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic.  The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership.  The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis.  However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences.  Only when this is the case does the mere fact of membership become something comparable to the other four grounds of persecution under the Act, namely, something that is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed.  By construing "persecution on account of membership in a particular social group" in this manner, we preserve the concept that refuge is restricted to individuals who are either unable by their own actions, or as a matter of conscience should not be required, to avoid persecution.

*Id.* at 233-34.

Under the standard established in *Matter of Acosta*, we have recognized "particular social groups" in a number of cases.  *Matter of V-T-S-*, 21 I&N Dec. 792, 798 (BIA 1997) (Filipinos of mixed Filipino-Chinese ancestry); *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996) (young women of the Tchamba-Kunsuntu tribe of northern Togo who did not undergo female genital mutilation as practiced by that tribe and who opposed the practice); *Matter of H-*, 21 I&N Dec. 337 (BIA 1996) (members of the Marehan subclan of Somalia who share ties of kinship and linguistic commonalities); *Matter of Toboso-Alfonso*, 20 I&N Dec. 819 (BIA 1990) (persons identified as homosexuals by the Cuban Government);  *Matter of Fuentes*, 19 I&N Dec. 658 (BIA 1988) (former members of the national police of El Salvador).

The First, Third, Sixth, and Seventh Circuits have adopted our *Acosta* formulation.  *See Castellano-Chacon v. INS*, 341 F.3d 533 (6th Cir. 2003) (applying *Acosta* to find that "tattooed youth" were not a "particular social group"); *Lwin v. INS*, 144 F.3d 505 (7th Cir. 1998) (finding that parents of Burmese student dissidents shared a common, immutable characteristic sufficient to comprise a particular social group); *Fatin v. INS*, 12 F.3d 1233, 1239-41 (3d Cir. 1993) (holding that a subgroup of Iranian feminists who

refuse to conform to the government's gender-specific laws and social norms may constitute a particular social group); *Ananeh-Firempong v. INS*, 766 F.2d 621, 626 (1st Cir. 1985) (applying *Acosta* in determining that family relations can be the basis of a particular social group).

The Ninth Circuit initially defined a "particular social group" as having a "voluntary associational relationship" among its members, described as a "collection of people closely affiliated with each other, who are actuated by some common impulse or interest." *Sanchez-Trujillo v. INS*, 801 F.2d 1571, 1576 (9th Cir. 1986). In a recent decision, however, the Ninth Circuit has recognized that groups sharing immutable characteristics, such as a familial relationship or sexual identity, could also be considered social groups within the meaning of the refugee definition. *Hernandez-Montiel v. INS*, 225 F.3d 1084, 1093 (9th Cir. 2000) (holding that a "'particular social group' is one united by a voluntary association, including a former association, *or* by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it").

The Second Circuit follows the Ninth Circuit's "voluntary associational relationship" standard, but also requires that the members of a social group must be externally distinguishable. *Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991) (explaining that "[l]ike the traits which distinguish the other four enumerated categories–race, religion, nationality and political opinion–the attributes of a particular social group must be recognizable and discrete)."

The United Nations High Commissioner for Refugees ("UNHCR") has recently adopted guidelines that combine elements of the *Acosta* immutable or fundamental characteristic approach, as well as the Second Circuit's "social perception" approach. *See* UNHCR, Guidelines on International Protection: "Membership of a particular social group" within the context of Article 1A(2) of the 1951 Convention and/or its 1967 Protocol relating to the Status of Refugees, U.N. Doc. HCR/GIP/02/02 (May 7, 2002), *available at* http://www.unhcr.org/cgi-bin/texis/vtx/publ/opendoc.pdf?tbl=PUBL&id=3 d58de2da ("UNHCR *Guidelines*"). The UNHCR *Guidelines* define a "particular social group" as

> a group of persons who share a common characteristic other than their risk of being persecuted, or who are perceived as a group by society. The characteristic will often be one which is innate, unchangeable, or which is otherwise fundamental to identity, conscience or the exercise of one's human rights.

*Id.* at ¶ 11.

Having reviewed the range of approaches to defining particular social group, we continue to adhere to the *Acosta* formulation. Under *Acosta*, we do not require a "voluntary associational relationship" among group members.

Nor do we require an element of "cohesiveness" or homogeneity among group members.  As discussed below, we have considered as a relevant factor the extent to which members of a society perceive those with the characteristic in question as members of a social group.

### B.  Application of the *Acosta* Formulation

The Eleventh Circuit has directed us to consider whether "noncriminal informants" are a particular social group in the context of this case.  We find that this group is too loosely defined to meet the requirement of particularity.  The group of "noncriminal informants" could potentially include persons who passed along information concerning any of the numerous guerrilla factions or narco-trafficking cartels currently active in Colombia to the Government or to a competing faction or cartel.  In considering whether informants are a particular social group, it is important to know the persons between whom the information is being provided, as well as the nature of the information passed along.

Although "noncriminal informants" do not constitute a particular social group, the respondent, in his initial appeal to the Board, referred to a subgroup of "former noncriminal government informants working against the Cali drug cartel."  On remand, the respondent also refers to "noncriminal drug informants working against the Cali drug cartel."  We understand the Eleventh Circuit's directive on remand to require consideration of these potentially narrower formulations of the particular social group within the larger group of noncriminal informants.  We therefore examine whether "noncriminal drug informants working against the Cali drug cartel" constitute a particular social group.

Nothing in the statute, the regulations, or case law provides a definitive answer to this question.  In its brief on remand, the Department of Homeland Security refers to a Tenth Circuit decision rejecting a social group claim based on alleged membership in a social group consisting of "persons who have worked as informants for drug enforcement agencies of the United States and who are in danger of being retaliated against upon return to [Mexico]" as "not supported by case law" or "by the principles underlying the Act."  *United States v. Aranda-Hernandez*, 95 F.3d 977, 980-81 (10th Cir. 1996).   The Tenth Circuit decision, however, mentions the social group argument only in passing and sheds little light on the resolution of the issue in this case.[3]

---

[3] The issue in *United States v. Aranda-Hernandez*, *supra*, was whether the respondent had been prejudiced by the Immigration Judge's rejection of his asylum claim.  The Immigration Judge had rejected the claim on the merits but had also found that the respondent was ineligible because of aggravated felony drug convictions.   It is not clear from the decision

(continued...)

Courts have recognized that informants in some situations may be able to demonstrate persecution on account of political opinion. *See, e.g.*, *Grava v. INS*, 205 F.3d 1177 (9th Cir. 2000) (stating that threats against whistleblower who reported corrupt behavior of government officials might be on account of political opinion); *Briones v. INS*, 175 F.3d 727 (9th Cir. 1999) (holding that death threats by a rebel group against confidential informer working for the government were on account of political opinion); *cf. Adhiyappa v. INS*, 58 F.3d 261 (6th Cir. 1995) (finding that evidence supported our conclusion that threats by terrorists were on account of status as a government informant rather than based on political opinion). As far as we have found, no court has held that government informants against a criminal enterprise such as a drug cartel constitute a particular social group. We therefore examine, as a matter of first impression, whether the respondent's past acts–passing along information concerning the Cali cartel to the Colombian Government–is the kind of shared past experience that constitutes membership in a particular social group.

### 1. Immutability Based on Past Experiences

The respondent asserts that the historical fact of having informed on the Cali cartel is an immutable characteristic within the meaning of *Acosta*. A past experience is, by its very nature, immutable, as it has already occurred and cannot be undone. However, that does not mean that any past experience that may be shared by others suffices to define a particular social group for asylum purposes. For example, we do not afford protection based on social group membership to persons exposed to risks normally associated with employment in occupations such as the police or the military. *Matter of Fuentes*, *supra*. In part, this is because persons accepting such employment are aware of the risks involved and undertake the risks in return for compensation. Similarly, a person who agrees to work as a government informant in return for compensation takes a calculated risk and is not in a position to claim refugee status should such risks materialize.

In *Matter of Fuentes*, *supra*, we stated that, although a former member of the national police in El Salvador could not demonstrate persecution as a member of a social group based on attacks by guerrillas while performing his official duties as a police officer, his status as a former member of the national police was "an immutable characteristic, as it is one beyond the capacity of the respondent to change." *Id.* at 662. Were a situation to develop in which

---

[3] (...continued)
the extent to which Aranda's social group argument may have been affected by his own involvement in drug transactions.

former police officers were targeted for persecution because of the fact of having served as police officers, a former police officer could conceivably demonstrate persecution based upon membership in a particular social group of former police officers.  On the other hand, if a former police officer were singled out for reprisal, not because of his status as a former police officer, but because of his role in disrupting particular criminal activity, he would not be considered, without more, to have been targeted as a member of a particular social group.

The respondent emphasizes in his brief on remand that he informed on the Cali cartel, not for compensation or other quid pro quo, but out of a sense of civic duty and moral responsibility.  The question in this case becomes whether the respondent's civic motives for working as a government informant distinguish his situation from that of informants employed by the government.  We find that the fact that the respondent acted out of a sense of civic responsibility does not suffice to define a subgroup of uncompensated informants who would be considered to constitute a particular social group. Some persons employed as informants or otherwise receiving compensation as informants, including police officers, also act partly out of a sense of civic responsibility.  Many such informants could plausibly claim that their primary motivation was a sense of civic duty and the compensation alone would not have provided sufficient incentive to undertake the risks involved.  Therefore, the distinction between informants who are compensated and those who act out of civic motives is not particularly helpful in addressing the question of who is deserving of protection under the asylum law.

## 2.  Visibility

Our decisions involving social groups have considered the recognizability, i.e., the social visibility, of the group in question. Social groups based on innate characteristics such as sex or family relationship are generally easily recognizable and understood by others to constitute social groups.  In considering clan membership in *Matter of H-*, *supra*, we did not rule categorically that membership in any clan would suffice.  Rather, before concluding that membership in the Marehan subclan in Somalia constituted membership in a particular social group, we examined the extent to which members of the purported group would be recognizable to others in Somalia. We found evidence in the record of "the presence of distinct and recognizable clans and  subclans in Somalia." *Id.* at 343.  Significantly, we found that the various clans could be differentiated based on linguistic commonalities as well as kinship ties.  We noted that the former Immigration and Naturalization Service's *Basic Law Manual* also recognized that "clan membership is a

highly recognizable, immutable characteristic that is acquired at birth and is inextricably linked to family ties." *Id.* at 342.

Our other decisions recognizing particular social groups involved characteristics that were highly visible and recognizable by others in the country in question. *See, e.g.*, *Matter of V-T-S-*, *supra* (Filipinos of mixed Filipino-Chinese ancestry); *Matter of Kasinga*, *supra* (young women of a particular tribe who were opposed to female genital mutilation); *Matter of Toboso-Alfonso*, *supra* (persons listed by the government as having the status of a homosexual); *Matter of Fuentes*, *supra* (former members of the national police). The two illustrations of past experiences that might suffice for social group membership provided in *Matter of Acosta*, *supra*, at 233, i.e., "former military leadership or land ownership," are also easily recognizable traits.

The recent *Guidelines* issued by the United Nations confirm that "visibility" is an important element in identifying the existence of a particular social group. The *Guidelines* explain that the social group category was not meant to be a "catch all" applicable to all persons fearing persecution. UNHCR *Guidelines*, *supra*, at ¶ 2. In this regard, the *Guidelines* state that "a social group cannot be defined *exclusively* by the fact that it is targeted for persecution." *Id.* However, "persecutory action toward a group may be a relevant factor in determining the *visibility* of a group in a particular society." *Id.* at ¶ 14 (emphasis added).

When considering the visibility of groups of confidential informants, the very nature of the conduct at issue is such that it is generally out of the public view. In the normal course of events, an informant against the Cali cartel intends to remain unknown and undiscovered. Recognizability or visibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of cartel members.

The respondent's reliance on the distinction between informants who act out of a sense of civic responsibility, rather than for compensation to limit the membership in the relevant social group, would also tie group membership to a factor not "visible" to the Cali cartel or to other members of society. Notably, there has been no showing that whether an informant was compensated is of any relevance to the Cali cartel. Nor would members of society in general recognize a social group based on informants who act out of a sense of civic duty rather than for compensation.

The record in this case indicates that the Cali cartel and other drug cartels have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises. In this sense, informants are not in a substantially different situation from anyone who has crossed the Cali cartel or who is perceived to be a threat to the cartel's interests. In fact, the Department of State country reports indicate that "[n]arcotics traffickers frequently resorted to terror in attempts to intimidate

the Government and *the general population*." Committees on Foreign Affairs and Foreign Relations, 103d Cong., 2d Sess., *Country Reports on Human Rights Practices for 1993* 393 (Joint Comm. Print 1994) (emphasis added). The victims of the narcotics traffickers included "politicians, labor organizers, human rights monitors, and–overwhelmingly–peasant farmers." Committees on International Relations and Foreign Relations, 104th Cong., 2d Sess., *Country Reports on Human Rights Practices for 1995* 362 (Joint Comm. Print 1996); Committees on Foreign Relations and International Relations, 104th Cong., 1st Sess., *Country Reports on Human Rights Practices for 1994* 350 (Joint Comm. Print 1995). While these respondents present very sympathetic personal circumstances, it is difficult to conclude that any "group," as actually perceived by the cartel, is much narrower than the general population of Colombia.

Given the voluntary nature of the decision to serve as a government informant, the lack of social visibility of the members of the purported social group, and the indications in the record that the Cali cartel retaliates against anyone perceived to have interfered with its operations, we find that the respondent has not demonstrated that noncriminal drug informants working against the Cali drug cartel constitute a "particular social group" as that term is used in the definition of a "refugee" in section 101(a)(42)(A) of the Act.

## III.  CONCLUSION

For the reasons stated above, we conclude that the lead respondent has not demonstrated that he was persecuted based on membership in a particular social group within the meaning of the "refugee" definition. We will therefore dismiss the respondents' appeal.

**ORDER:**  The respondents' appeal is dismissed.

**FURTHER ORDER:**  Pursuant to the Immigration Judge's order and in accordance with our decision in *Matter of Chouliaris*, 16 I&N Dec. 168 (BIA 1997), the respondents are permitted to depart from the United States voluntarily within 30 days from the date of this order or any extension beyond that time as may be granted by the district director; and in the event of failure so to depart, the respondents shall be deported as provided in the Immigration Judge's order.