**FILED**
**United States Court of Appeals**
**Tenth Circuit**

## UNITED STATES COURT OF APPEALS

### FOR THE TENTH CIRCUIT

**April 13, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

_____

MARLENE MARISOL JIRON-DE
LOPEZ,

     Petitioner,

v.

TODD BLANCHE, Acting United States
Attorney General,[*]

     Respondent.

No. 22-9562
(Petition for Review)

_____

### ORDER AND JUDGMENT[**]

_____

Before **MATHESON**, **BACHARACH**, and **CARSON**, Circuit Judges.

_____

Marlene Marisol Jiron-De Lopez is a native and citizen of El Salvador who

entered the United States without permission. An immigration judge (IJ) found her

---

[*] Todd Blanche became the Acting Attorney General of the United States on April 2, 2026, and he has been substituted as Respondent. See Fed. R. App. P. 43(c)(2).

[**] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

removable and ineligible for asylum,[1] and ordered that she be returned to her home country. The Board of Immigration Appeals (BIA) dismissed her appeal in a single-member summary order. Jiron now petitions for review of the BIA's decision. We have jurisdiction under 8 U.S.C. § 1252(a), and we grant the petition.

## I.    STANDARD OF REVIEW

"[W]here the BIA determines a petitioner is not eligible for relief [from removal], we review the decision to determine whether the record on the whole provides substantial support for that determination." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). In so doing, we must treat "administrative findings of fact [as] conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "[W]e will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Uanreroro*, 443 F.3d at 1204.

## II.    BACKGROUND & PROCEDURAL HISTORY

Jiron was born and raised in El Salvador and lived a normal life there until the year 2015. That year, her husband discovered his brother-in-law was stealing from the company they both worked for. The brother-in-law in turn discovered that Jiron's husband had found him out. Jiron's husband was fired from his job and, a few months later, gunned down in broad daylight.

---

[1] The IJ also found Jiron ineligible for other forms of relief, but Jiron does not argue those rulings were error, so we do not address them.

2

The police identified four MS-13 gang members as the suspects. Jiron does not know what happened with the charges against them. Shortly after the murder, however, she filed a civil action against the four suspects, seeking $700 to cover funeral expenses.

After filing the suit, Jiron began receiving frequent calls and texts from gang members threatening her with death if she did not drop the case. In March 2016, while driving late at night, an armed man forced her to pull over and step out of her car. He then took her into the roadside bushes, beat her on the head with his gun, raped her, and told her that he was doing it because she had not withdrawn her lawsuit.

Jiron reported the attack to the police but nothing happened. She soon fled El Salvador, came to the United States, and requested asylum based on "membership in a particular social group." *See* 8 U.S.C. § 1101(a)(42)(A) (establishing that asylum seekers must be "unable or unwilling to return to" their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion"). She defined her social group as "Salvadoran witnesses who testify or are perceived to testify against gang members." R. at 463 (emphasis omitted).

At Jiron's asylum hearing, the IJ found her testimony about her ordeal credible. The IJ further found, however, that Jiron failed to prove the gang members threatened and attacked her on account of her membership in the claimed social group: "the gang members [instead] took actions against [her] out of their own desire

3

to further their criminal enterprise and to punish [her] for bringing a suit against them." R. at 78. The IJ accordingly denied asylum.[2]

Jiron appealed to the BIA. In her brief to that tribunal, she described her particular social group as "Salvadoran women who testify or are perceived to testify against gang members," R. at 25 (internal quotation marks omitted), replacing "witnesses" with "women." This may have been inadvertent, given that her BIA brief frames this as the same claim she "articulated" to the IJ. *Id.* The BIA said nothing about the difference. It assumed this was a cognizable social group and upheld the IJ's conclusion that the gang's actions had not been motivated by Jiron's membership in this group:

> [W]e discern no clear error in the Immigration Judge's finding that the motivation of those who threatened and harmed [Jiron] was and would be to further their criminal enterprise and retaliate against [her] for participating in a lawsuit against them, and not to overcome [her] membership in any particular social group, including "Salvadoran women who testify or are perceived to testify against gang members."

R. at 4. The BIA therefore dismissed the appeal.

## III.    ANALYSIS

Jiron says "[t]his case boils down to a single issue—whether there is any meaningful difference between the agency's description of the motive of the MS-13

---

[2] The IJ alternatively concluded that "Salvadoran witnesses who testify or are perceived to testify against gang members" did not meet the agency's test for a cognizable social group. The BIA, however, did not adopt this reasoning, so we must ignore it, *see Uanreroro*, 443 F.3d at 1204.

gang members who raped, assaulted, and threatened [her], and her own description of that motive." Pet'r Opening Br. at 23. "What is the difference," she asks, "between a gang member raping [her] to retaliate against her for participating in a lawsuit against the gang [the motive attributed by the BIA], and a gang member raping her because the gang seeks to punish those individuals who testify against them in legal proceedings [a paraphrase of her claimed social group]?" *Id.* at 24. We agree with the rhetorical implications of these questions, and we will remand to the BIA for further proceedings.

To repeat, the BIA assumed that "Salvadoran women who testify or are perceived to testify against gang members" qualifies as a particular social group. It then upheld the IJ's finding that the gang's motivation for harassing and attacking Jiron was:

1. "to further their criminal enterprise and"

2. "retaliate against [her] for participating in a lawsuit against them, and not"

3. "to overcome [her] membership in any particular social group, including 'Salvadoran women who testify or are perceived to testify against gang members.'"

R. at 4. We will first focus on parts 2 and 3 of this explanation, and then return to part 1.

### A.    Retaliation vs. "Overcoming" Social Group Membership

Parts 2 and 3 are not easily reconciled. Beginning with part 3, the only plausible interpretation of "overcome [her] membership in [her claimed] social

group" is to persuade her to *leave* that group, meaning to stop being a person who testifies against the gangs—or in other words, to drop her lawsuit. Thus, it is as if the BIA said the gang's motivation was to retaliate against Jiron for bringing the lawsuit (part 2) but *not* to persuade her to drop the lawsuit (part 3).

We may "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). In that light, we can imagine a situation where an act of retaliation is a one-off event that leaves the gang feeling satisfied, *i.e.*, with no further intention to attack or harass the victim. If that were the case, then there could be a sensible distinction between parts 2 and 3.

We may not infer such a distinction here. There is no record evidence the gang viewed the score as settled after the roadside beating and rape. To the contrary, Jiron (whom the IJ found credible) testified that she spent two months after the attack "running from" the gang within El Salvador, R. at 146, while threatening phone calls continued, R. at 174. Thus, we are left with a contradictory explanation from the BIA: the gang both was and was not motivated by a desire to persuade Jiron to drop the lawsuit.

Later in the same paragraph of the BIA's decision, however, the BIA provided the following quote from *Matter of H-L-S-A-*, 28 I. & N. Dec. 228, 238 (BIA 2021): "Even if the gang members knew or suspected that [the applicant] had provided law enforcement with information about them, this 'individual retaliation' does not

6

qualify as persecution based on [the applicant's] membership in [the] proposed group." *See* R. at 4. If this was meant as a supporting citation, the relevance is unclear. *H-L-S-A-* was not analyzing the nexus requirement. It was considering the validity of "prosecutorial witnesses" as a particular social group. 28 I. & N. Dec. at 230, 238 (internal quotation marks omitted). Moreover, *H-L-S-A-* was not conceding the viability of the social group and denying a nexus. Rather, it was denying a nexus *because* there was no viable social group: "Because the applicant has not demonstrated that his proposed social group is sufficiently particular or socially distinct in Salvadoran society, he has not established that there is a clear probability that he will experience persecution in El Salvador on account of a valid particular social group under the Act." *Id.* at 239. In Jiron's case, by contrast, the BIA assumed the validity of her proposed social group.

The BIA may have also quoted *H-L-S-A-* for the distinction between individual retaliation and group persecution. The problem here is that neither the IJ nor the BIA pointed to any evidence suggesting the gang: (a) was interested in stopping Jiron's lawsuit specifically, as distinct from other legal actions it would choose to ignore; or (b) had a unique grudge against Jiron. We likewise could not find any such evidence in the record. Thus, even under the "less than ideal clarity" principle, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (internal quotation marks omitted), we see no basis to uphold the BIA's decision.

The government points us to *Orellana-Recinos v. Garland*, 993 F.3d 851 (10th Cir. 2021), a case in which the asylum applicant was receiving threats from

MS-13 because her son had refused to join the gang, *see id.* at 853. She defined her particular social group as the immediate family of her son, which the agency accepted as a valid social group. *See id.* at 854. The agency, however, found no nexus between the gang's motivations and that social group. *See id.* at 854–55. We upheld this determination because "membership in a particular social group should not be considered a *motive* for persecution if the persecutors are simply pursuing their distinct objectives and a victim's membership in the group is relevant only as a means . . . to effectuate their objectives." *Id.* at 856.

We are not persuaded *Orellana-Recinos* supports the BIA's decision in Jiron's case. The government does not tell us what distinct objective the gang was pursuing, to which Jiron's membership in her social group was only incidental. To the contrary, the BIA stated that the gang wanted to "retaliate against [Jiron] for participating in a lawsuit against them." R. at 4. As we have already noted, we do not see a meaningful difference between this motivation and the desire to "overcome [her] membership" in her articulated social group. *Id.* In short, as explained by the BIA, the gang's objective was not incidental to that social group, but intended to persuade Jiron to withdraw her "membership" in that group.

For these reasons, we agree with Jiron that parts 2 and 3 of the BIA's explanation are contradictory.

## B.    Furthering the Gang's Criminal Enterprise

Returning now to part 1, the BIA said that one of the gang's motivations was to "further [its] criminal enterprise." R. at 4. "[W]e can uphold administrative action

8

when an agency gives two independent reasons and only one of them is valid." *Zzyym v. Pompeo*, 958 F.3d 1014, 1033–34 (10th Cir. 2020).  If this is an independent reason for denying relief, then we could affirm on this explanation alone.  That would be inappropriate under these circumstances, however, for two reasons.

First, the brevity of the BIA's analysis makes it unclear whether its mention of the gang furthering its criminal enterprise was truly meant as a distinct explanation for the gang's motivations, independent of its desire to retaliate.  "If we can't determine whether the agency necessarily relied on deficient reasons . . . remand is appropriate . . . ." *Id.* at 1033.

Second, the only relevant case cited by the BIA is, again, *H-L-S-A-*.  As we have already explained, *H-L-S-A-* is about the viability of the claimed social group, which is not at issue here.

The BIA's reference to the gang "further[ing] [its] criminal enterprise" may also be an allusion to *In re C-A-*, 23 I. & N. Dec. 951 (BIA 2006), which appears to be the first BIA decision to give significant weight to the idea of "criminal enterprise" when evaluating gang-based persecution in the asylum context.  In *C-A-*, the asylum applicant framed his particular social group as "noncriminal drug informants working against the Cali drug cartel," *id.* at 957 (internal quotation marks omitted), and the viability of the applicant's claimed social group turned on the BIA's requirement that members of a particular social group "share a common, immutable characteristic," potentially including "a shared past experience such as former military leadership or land ownership," *id.* at 955 (internal quotation marks omitted).

Under the circumstances, the question before the BIA was "whether the [applicant's] past acts—passing along information concerning the Cali cartel to the Colombian Government—is the kind of shared past experience that constitutes membership in a particular social group." *Id.* at 958.

The BIA concluded the applicant could not satisfy the standard because: (i) by nature, the group was not socially visible in general Colombian society, *id.* at 959–60; and (ii) there was not enough evidence that the cartel itself viewed the claimed social group as particular, *id.* at 960–61. As to the latter point, the BIA noted the cartel's indiscriminate pursuit of its "criminal enterprises":

> The record in this case indicates that the Cali cartel and other drug cartels have directed harm against anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises. In this sense, informants are not in a substantially different situation from anyone who has crossed the Cali cartel or who is perceived to be a threat to the cartel's interests. . . . The victims of the narcotics traffickers include[] politicians, labor organizers, human rights monitors, and— overwhelmingly—peasant farmers. While these [asylum applicants] present very sympathetic personal circumstances, it is difficult to conclude that any "group," as actually perceived by the cartel, is much narrower than the general population of Colombia.

*Id.* (citations and internal quotation marks omitted).

If the BIA's mention of MS-13's "criminal enterprise" in Jiron's case was meant to draw upon *C-A-*'s reasoning, the problem is the same as discussed in the context of *H-L-S-A-*—the issue in *C-A-* was whether a claimed social group was sufficiently particular, not whether the persecutors acted on account of a particular

10

social group.  *C-A-* (and *H-L-S-A-*) would be relevant if the BIA had ruled that "Salvadoran women [or witnesses] who testify or are perceived to testify against gang members" was not particular enough to count as a particular social group.  But the BIA instead assumed that this was a valid social group and stated that the gang was motivated by a desire to retaliate against her for filing the lawsuit—precisely the act that put her in the assumed-to-be-valid social group.

\* \* \*

"We cannot perform a meaningful review where the [BIA] does not sufficiently articulate its reasoning."  *Mickeviciute v. INS*, 327 F.3d 1159, 1162 (10th Cir. 2003).  That is the case here.  The BIA's reasoning appears self-contradictory.  Remand is therefore appropriate.

As for the scope of remand, Jiron asks us "to find that the [BIA's] motive holding supports her coextensive argument that she was persecuted on account of her membership in a particular social group."  Pet'r Opening Br. at 25.  In turn, she asks us "to remand proceedings to the [BIA] for consideration of any *remaining* eligibility requirements for asylum and withholding."  *Id.* (emphasis added).  In effect, she argues this court should lock the BIA into a finding that the gang persecuted her on account of her particular social group.

We disagree that this is the proper course.  Relatedly, we emphasize this is not a limited remand solely to clarify the contradiction we have noted.  Rather, we vacate the BIA's decision in full and remand so it may consider Jiron's appeal anew.

11

## IV.    CONCLUSION

We grant the petition for review, vacate the BIA's decision, and remand for further proceedings consistent with this order and judgment.

Entered for the Court


Joel M. Carson III
Circuit Judge