Opinion by Judge BEA; Concurrence by Judge McKEOWN; Dissent by Chief Judge KOZINSKI.
*1083 OPINION
BEA, Circuit Judge:
Rocío Brenda Henriquez-Rivas petitions for review of a decision of the Board of Immigration Appeals (“BIA”) sustaining the government’s appeal of an Immigration Judge’s (“IJ”) grant of asylum, and denying her applications for withholding of removal and protection under the Convention Against Torture. Henriquez-Rivas claims she is entitled to asylum because, as a person who testified in a criminal trial against members of a gang who killed her father in El Salvador, she is a member of a particular social group, on account of which she faces a well-founded fear of persecution if she were to return to El Salvador. For the reasons discussed below, we find that the BIA misapplied its own precedent in holding that witnesses who testify against gang members may not constitute a particular social group due to a lack of social visibility. Accordingly, we grant Henriquez-Rivas’ petition for review and remand to the BIA for further proceedings.
I. Statutory Framework
Under the Immigration and Naturalization Act (“INA”), the Attorney General may grant asylum to a “refugee.” 8 U.S.C. § 1158(b)(1)(A). To qualify as a refugee, an alien must prove that he is unwilling or unable to return to his country of origin “because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.” 8 U.S.C. § 1101(a)(42). “An applicant alleging past persecution has the burden of establishing that (1) his treatment rises to the level of persecution; (2) the persecution was on account of one or more protected grounds; and (3) the persecution was committed by the government, or by forces that the government was unable or unwilling to control.” Bagh-dasaryan v. Holder, 592 F.3d 1018, 1023 (9th Cir.2010).
“If past persecution is established, a rebuttable presumption of a well-founded fear arises, 8 C.F.R. § 208.13(b)(1), and the burden shifts to the government to demonstrate that there has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear.” Tawadrus v. Ashcroft, 364 F.3d 1099, 1103 (9th Cir.2004) (internal quotation marks omitted).
The term “particular social group” is ambiguous. Donchev v. Mukasey, 553 F.3d 1206, 1215 (9th Cir.2009). The BIA first interpreted the term “particular social group” in Matter of Acosta, 19 I. & N. Dec. 211 (BIA 1985), overruled on other grounds by Matter of Mogharrabi, 19 I. & N. Dec. 439 (BIA 1987). In Acosta, the alien argued that he was a member of a particular social group comprising members of a taxi driver cooperative in El Salvador. 19 I. & N. Dec. at 232. The BIA defined a “particular social group” as follows:
[W]e interpret the phrase “persecution on account of membership in a particular social group” to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic. The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should *1084 not be required to change because it is fundamental to their individual identities or consciences.
Id. at 233. Applying that definition in Acosta, the BIA rejected the alien’s arguments because the identifying characteristic of the group (working as a taxi driver) was not immutable. Taxi drivers could change jobs at any time. Id. at 234.
In the years following Acosta, the BIA found that each of the following were members of a particular social group: former members of the Salvadoran national police;[1] homosexuals in Cuba who were forced to register with the government;[2] young female members of a tribe in Togo who had not undergone female genital mutilation and were opposed to the practice;[3] and Filipinos of mixed Filipino-Chinese ancestry.[4]
We adopted the Acosta definition of “particular social group” in Hernandez-Montiel v. INS, 225 F.3d 1084, 1092-93 (9th Cir.2000), overruled on other grounds by Thomas v. Gonzales, 409 F.3d 1177 (9th Cir.2005) (en banc).[5] In Hernandez-Montiel, we held that a particular social group “is one united by a voluntary association, including a former association, or by an innate characteristic that is so fundamental to the identities or consciences of its members that members either cannot or should not be required to change it.” Id. at 1093 (emphasis in original). Applying that framework to the facts of Hemandez-Montiel, we held that male homosexuals with female sexual identities qualified as a particular social group because they shared an immutable characteristic “so fundamental to one’s identity that a person should not be required to abandon [it].” Id. at 1093-94.
In 2006, the BIA refined the Acosta standard by stating that an asylum applicant must also demonstrate that his proposed particular social group has “social visibility” and “particularity.” Matter of C-A-, 23 I. & N. Dec. 951, 957, 960 (BIA 2006). In C-A-, the BIA held that a group of “noncriminal drug informants working against the [Colombian] Cali drug cartel” was not a particular social group because the group did not have “social visibility” or “particularity.” Id. at 961. The BIA stated that, in so holding, it was not departing from its prior precedent: “[W]e continue to adhere to the Acosta formulation.” Id. at 956.
In C-A-, the BIA discussed some groups that are “understood by others to constitute social groups,” id. at 959, and other groups that are “highly visible and recognizable by others in the country in question,” id. at 960. The BIA rejected the proposed social group in C-A-, noting that “the very nature of the conduct at issue is such that it is generally out of the public view.” Id. at 960. The BIA said that “[r]ecognizability or visibility is limited to those informants who are discovered because they appear as witnesses or other *1085 wise come to the attention of cartel members.” Id.
BIA cases following C-A- further elaborated the meaning of the additional criteria of “social visibility” and “particularity.” In Matter of S-E-G-, the petitioners were three siblings from El Salvador who were threatened by Mara Salvatrucha (“MS-13”) gang members after refusing gang recruitment attempts. 24 I. & N. Dec. 579, 579-80 (BIA 2008). The BIA affirmed the IJ’s denial of asylum,. finding that the proposed social group of “Salvadoran youth who have been subjected to recruitment efforts by MS-13 and who have rejected or resisted membership in the gang based on their own personal, moral, and religious opposition to the gang’s values and activities” did not have “particularity” or “social visibility.” Id. at 581, 583. The group lacked “particularity” because the category was too “amorphous” and the group membership was not easily definable. Id. at 584-85. The group was also not “socially visible”: “There is little in the background evidence of record to indicate that Salvadoran youth who are recruited by gangs but refuse to join ... would be ‘perceived as a group’ by soci-ety_” Id. at 587; see also Matter ofE-A-G-, 24 I. & N. Dec. 591, 594 (BIA 2008) (reversing IJ’s grant of asylum after defining “social visibility” in terms of “social perception”: “respondent does not allege that he possesses any characteristics that would cause others in Honduran society to recognize him as one who has refused gang recruitment”).
Following C-A- and subsequent BIA cases, we have applied the “social visibility” requirement as one of general social “perception” rather than of on-sight visibility. In Santos-Lemus v. Mukasey, we concluded that the proposed group of “young men in El Salvador resisting gang violence” was not socially visible; there was no evidence that the petitioner would be “perceived ... to be a member of any kind of anti-gang group.” 542 F.3d 738, 745-46 (9th Cir.2008) (emphasis added). We similarly held in Ramos-Lopez v. Holder that Honduran men who resisted recruitment into the MS-13 were not “socially visible” because there was no evidence that they were “generally visible to society.” 563 F.3d 855, 862 (9th Cir.2009).
Most circuits have accepted the BIA’s “social visibility” and “particularity” criteria. See, e.g., Gaitan v. Holder, 671 F.3d 678, 681-82 (8th Cir.2012); Rivera-Barrientos v. Holder, 666 F.3d 641, 649-52 (10th Cir.2012); Scatambuli v. Holder, 558 F.3d 53, 59-60 (1st Cir.2009). But the Third and Seventh Circuits have rejected “social visibility” as an unreasonable interpretation of the ambiguous statutory term. See Valdiviezo-Galdamez v. Att’y Gen., 663 F.3d 582, 606-07 (3d Cir.2011); Gatimi v. Holder, 578 F.3d 611, 615-16 (7th Cir.2009). The Third Circuit also rejected “particularity” as merely a “different articulation ] of the [‘social visibility’] concept.” Valdiviezo-Galdamez, 663 F.3d at 608.
II. Factual Background and Proceedings Below
With this framework in mind, we turn now to the facts of the case. Rocio Brenda Henriquez-Rivas is a native and citizen of El Salvador. In 1998, when Henriquez-Rivas was twelve years old, her father was murdered by four members of the M-18 street gang. Two of the men were known as “Chimbera” and “Popo.” Henriquez-Rivas saw the men enter her house and assault her father. They told her father to ask for forgiveness, which he did. Thinking the men were going to attack her, Henriquez-Rivas fled. As she was running away from the house, Henriquez-Ri-vas heard four gun shots. She did not see who fired the gun, but her sister Mirabel told her that Chimbera shot her father. *1086 When the police arrived, they told Henri-quez-Rivas that her father was dead.
Henriquez-Rivas identified two of the suspects in a lineup behind protective glass. She also testified against them in court. Both Chimbera and Popo were present in court while Henriquez-Rivas testified, and both were convicted. Chimbera was sentenced to 7 years in prison because he was a minor and Popo was sentenced to 25 to 30 years in prison.
After her father’s death, Henriquez-Ri-vas lived with her half-sister, Olga. In 2000, when Henriquez-Rivas returned to her father’s house to get some paperwork, a man by the name of Julio told her not to return to the house. Julio explained that some men had been at her house and mentioned to Julio that they killed her father at the direction of someone else.
At her asylum hearing, Henriquez-Rivas testified that her family members saw Chimbera, who had been released from prison, about two times between 1999 and 2004. In 1999, one of Henriquez-Rivas’ sisters saw Chimbera a block from her house and called the police. The police arrived and arrested Chimbera. Another time, Mirabel, Henriquez-Rivas’ younger sister who also witnessed the murder, saw Chimbera on the bus working as a fare collector. Chimbera saw Mirabel and stared at her. For this reason, Mirabel later came to the United States. Henri-quez-Rivas did not personally encounter Chimbera.
In 2005, a man came to Henriquez-Ri-vas’ school and asked if anyone knew “Ro-cío Henriquez.” She thought it was strange that the man would ask for her, so she denied knowing a Rocio Henriquez. Henriquez-Rivas then decided to leave El Salvador. She believed that if she remained in El Salvador the gang members would harm her for testifying against them and because they were required to pay restitution to her family. After Henri-quez-Rivas left for the United States, she learned that Chimbera had come to her town asking for her.
Henriquez-Rivas entered the United States, without inspection, on January 16, 2006. The Department of Homeland Security initiated removal proceedings against her on the ground that she was “an alien present in the United States without being admitted or paroled.” 8 U.S.C. § 1182(a)(6)(A)(i). She conceded remova-bility, and filed an application for asylum, withholding of removal, and protection under the Convention Against Torture.
After a hearing, the IJ found Henri-quez-Rivas’ testimony credible. The IJ concluded that Henriquez-Rivas did not establish she was persecuted on account of political opinion, but concluded that Henriquez-Rivas did establish she was a member of the particular social group of “people testifying against or otherwise opposing] gang members.” The IJ found she had suffered past persecution in El Salvador because her father was murdered, the gang members tried to kill her when they killed her father, and she was threatened by gang members after testifying against them in court. The IJ also concluded that Henriquez-Rivas had established a well-founded fear of future persecution, as there was “a reasonable possibility of suffering such persecution [if] she were to return to El Salvador.” The IJ further found that the Salvadoran government is unable to control gang violence, that the government did not prove changed country conditions, and that internal relocation would not be reasonable. The IJ granted asylum on that basis.
The BIA reversed the IJ’s decision. The BIA reversed the determination that the group of “people testifying against or otherwise [opposing] gang members” constitutes a particular social group. The BIA concluded that the proposed group *1087 lacked the requisite “social visibility” to qualify as a particular social group. Hen-riquez-Rivas petitioned for review. A three-judge panel of our court initially denied Henriquez-Rivas’ petition for review. We granted rehearing en banc.
III. Standards of Review
We review questions of law de novo. Santos-Lemus, 542 F.3d at 742. We review the BIA’s factual findings for substantial evidence. Id. The BIA’s construction of ambiguous statutory terms in the INA through case-by-case adjudication is entitled to deference under. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). INS v. Aguirre-Aguirre, 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999). If the BIA’s construction is reasonable, we must accept that construction under Chevron, even if we believe the agency’s reading is not the best statutory interpretation. See Nat’l Cable & Telecomms. Ass’n v. Brand X Internet Servs., 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). The standard of review is not necessarily “more searching” if the BIA’s decision represents a change from prior agency policy. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 514, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009).
IV. Discussion
A.
Much of the inter-circuit disagreement over the “social visibility” requirement relates to an ambiguity in the BIA’s use of the term. Does it mean that the proposed particular social group is “understood by others to constitute [a] social group[ ]”? CA-, 23 I. & N. Dec. at 959 (emphasis added). Or, does it mean a bystander can literally see the difference that makes that person a member of the group (so-called “on-sight” or ocular visibility)? Cf. In re A-M-E & J-GU-, 24 I. & N. Dec. 69, 74 (BIA 2007) (citing C-A- 23 I. & N. Dec. at 956) (in denying particular social group status to the proposed group “affluent Guatemalans,” the BIA stated that “the shared characteristic of the group should generally be recognizable by others in the community”) (emphasis added). As Judge Posner stated when writing for the Seventh Circuit in Gatimi:
If you are a member of a group that has been targeted for assassination or torture or some other mode of persecution, you will take pains to avoid being socially visible; and to the extent that the members of the target group are successful in remaining invisible, they will not be “seen” by other people in the society “as a segment of the population.”
578 F.3d at 615. The Third Circuit similarly criticized any notion that “social visibility” was limited to persons who could be identified as members of a group just by their appearance:
Here, the government contends that “social visibility” does not mean on-sight visibility. Rather, we are told that “social visibility” is a means to discern the necessary element of group perceptibility, i.e., the existence of a unifying characteristic that makes the members understood by others in society to constitute a social group or recognized as a discrete group in society. We have a hard time understanding why the government’s definition does not mean “on-sight visibility,” and we join the Court of Appeals for the Seventh Circuit in wondering “even-whether [the BIA] understands the difference.”
Valdiviezo-Galdamez, 663 F.3d at 606-07 (alteration in original) (footnote omitted).
We agree that a requirement of “on-sight” visibility would be inconsistent with previous BIA decisions and likely impermissible under the statute. However, we *1088 do not read C-A- and subsequent eases to require “on-sight” visibility. To be sure, it is difficult to articulate precisely what the BIA meant by “social visibility” in C-A-. The BIA’s elaboration in case-by-case adjudication subsequent to C-A- is somewhat inconsistent, as discussed below. But an “on-sight” visibility requirement would not make sense when coupled with the discussion in C-A- of previous BIA decisions. See C-A-, 23 I. & N. Dec. at 959-60.[6] Referencing Acosta’s examples of “former military leadership or land ownership” during its discussion of “social visibility,” the BIA called them “easily recognizable traits.” Id. Those traits would not be “easily recognizable” if the “social visibility” criterion required “on-sight” visibility, since former military officers do not always wear epaulets, nor do landowners wear T-shirts mapping their holdings. Instead, the key in these older BIA cases, as well as in C-A-, is whether the social groups are “understood by others to constitute social groups.” Id. at 959 (emphasis added).
Further, the statement in C-A- that “the very nature of the conduct at issue is such that it is generally out of the public view” should be understood in the context of societal understanding, not “on-sight” visibility. Id. at 960. It is true that informants against criminal cartels generally take pains to stay out of the public view. Those informants who are discovered, however, are socially visible under C-A-• “Recognizability or visibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of cartel members.” Id. Thus, anti-cartel informants, who might not be recognizable on-sight as members of that group, would be socially visible — particularly to revenge-seeking cartel members — if their identity were discovered because they testified in court, as Henriquez-Rivas did here.[7]
Subsequent BIA cases do not interpret C-A- as imposing an “on-sight” visibility requirement. See S-E-G-, 24 I. & N. Dec. at 587 (asking whether the proposed social group of Salvadoran youth who had resisted recruitment efforts from the MS-13 gang would be “perceived as a group” by society); E-A-G-, 24 I. & N. Dec. at 594 (considering whether society would recognize respondent, a Honduran youth, as having resisted gang recruitment after defining “social visibility” as “the extent to which members of a society perceive those with the characteristic in question as members of a social group”).[8]
Our own case law following C-A- has similarly declined to impose an “on-sight” visibility requirement. Instead, we have required that the shared characteristic “ ‘generally be recognizable’ ” by other members of the community, or evidence *1089 that members of the proposed group would be “ ‘perceived as a group’ by society.” Santos-Lemus, 542 F.3d at 746 (quoting S-E-G-, 24 I. & N. Dec. at 586-87).
Absent a requirement of on-sight visibility, “social visibility” as detailed in C-A- is consistent with BIA precedent prior to CA-. It defines “social visibility” in terms of perception by a society, not ocular recognition. So construed, C-A- was merely a refinement of Acosta. So long as the “social visibility” and “particularity” criteria are applied in a way that did not directly conflict with prior agency precedent, we would be hard-pressed to reject the new criteria as unreasonable under Chevron. See Marmolejo-Campos v. Holder, 558 F.3d 903, 914 (9th Cir.2009) (en banc).
Concluding that social visibility refers to “perception” rather than “on-sight” visibility does not fully clarify the requirement. Neither we nor the BIA has clearly specified whose perspectives are most indicative of society’s perception of a particular social group: the Petitioner herself? Her social circle? Her native country as a whole? The United States? The global community? [9] Different audiences will be more or less likely to consider a collection of individuals as a social group depending on their own history, course of interactions with the group, and the overall context. Although we leave it to the BIA to decide this issue in the first instance, we think that some observations may be in order as it considers the issue anew.
Looking to the text of the statute, in the context of persecution, we believe that the perception of the persecutors may matter the most. Under the INA, a petitioner’s belief that she has been persecuted does not alone prove persecution; rather, she must show persecution or a well-founded fear of future persecution on account of a protected ground. 8 U.S.C. § 1101(a)(42)(A). The petitioner is persecuted precisely because the persecutor recognizes the object of his persecution. Further, the petitioner’s awareness of her own group status is not a baseline requirement&emdash;for example, an infant may not be aware of race, sex, or religion. Society in general may also not be aware of a particular religious sect in a remote region. However, a group may be persecuted because of the persecutor’s perceptions of the existence of those groups. Cf. Sanchez-Trujillo, 801 F.2d at 1576 (holding that the proposed group, “young, urban, working class males of military age who had never served in the military,” did not constitute a particular social group, we suggested that “a persecutor’s perception of a segment of a society as a ‘social group’ ” could be relevant to the particular social group analysis).[10] We do not mean to imply that an alien should be required in every case to prove that his persecutors perceived his social group to be socially visible. When there is evidence that a social group is visible to society, there is no need to prove that the petitioner’s persecutors perceived *1090 that group as visible. See Matter of R-A-22 I. & N. Dec. 906, 918 (BIA 2001) (en banc) (noting that a “showing of how the characteristic is understood in the alien’s society ... may [help us to] understand that the potential persecutors in fact see persons sharing the characteristic as warranting suppression or the infliction of harm.”).[11] We mean only to suggest that evidence of perceptions in society as a whole is not the exclusive means of demonstrating social visibility. When a particular social group is not visible to society in general (as with a characteristic that is geographically limited, or that individuals may make efforts to hide), social visibility may be demonstrated by looking to the perceptions of persecutors. Such perceptions may be highly relevant to, or even potentially dispositive of, the question of social visibility. Cf. Sanchez-Trujillo, 801 F.2d at 1576 & n. 7. By highlighting the perception of the persecutor, other demographic divisions would become less relevant. One would ask whether, as far as the persecutor is concerned, there is a particular characteristic (such as male homosexuals with female sexual identities, see Hernandez-Montiel v. INS, 225 F.3d 1084, 1093 (9th Cir.2000)), that defines a finite collection of individuals as a group. If the answer is yes, the fact that those individuals may have a variety of other characteristics, and belong to various other groups, would not be a bar to potential relief.
We next consider the “particularity” requirement. Admittedly, both BIA and our own precedent have blended the “social visibility” and “particularity” analysis: “social visibility” has been determined based on perception, as discussed above, and “particularity” too has been based on society’s perception whether a group has deli-mitable boundaries. See, e.g., Ramos-Lopez v. Holder, 563 F.3d 855, 861 (9th Cir.2009) (affirming the BIA’s determination that petitioner, asserting membership in a particular social group comprised of Honduran males who had resisted MS-13 recruitment efforts, failed the particularity requirement because there was no indication that there was “any perception that the males in question were members of a class”) (internal quotation marks omitted); S-E-G- 24 I. & N. Dec. at 584 (“The essence of the ‘particularity’ requirement ... is whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons.” (emphasis added)). Consideration of the “plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings” among the members of the group also seems to pertain to “social visibility” rather than “particularity”: the point is that the diverse backgrounds of members of the purported group may prevent them from being perceived as belonging to the same group. Soriano v. Holder, 569 F.3d 1162, 1166 (9th Cir.2009) (quoting Sanchez-Trujillo, 801 F.2d at 1577) (internal quotation marks omitted).[12] It is therefore *1091 unsurprising that, given the way the BIA has applied the term, the Third Circuit has concluded that “ ‘[particularity appears to be little more than a reworked definition of ‘social visibility.’ ” Valdiviezo-Galdamez, 663 F.3d at 608.
We will not go quite so far. The “particularity” requirement is separate, and it is relevant in considering whether a group’s boundaries are so amorphous that, in practice, the persecutor does not consider it a group. The ultimate question is whether a group “can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons.” S-E-G-, 24 I. & N. Dec. at 584. If a persecutor does not actually rely on specific boundaries or definitions to identify the group, it may be more difficult to believe that a collection of individuals is in fact perceived as a group. Ultimately, the “particularity’ consideration is merely one factor as to whether a collection of individuals is considered to be a particular social group in practice.
We clarify the “social visibility” and “particularity criteria without reaching the ultimate question of whether the criteria themselves are valid. The BIA could find that Henriquez-Rivas’ proposed social group is cognizable under either the Acosta immutability standard or the newer standard that considers “social visibility” and “particularity.” Thus, we need not decide, in this case, at this time, whether we should align ourselves with the Third and Seventh Circuits and invalidate these requirements.
B.
We now turn to reviewing the BIA’s application of its particular social group precedent to the facts of this case. The BIA concluded that the proposed social group of people who testified against gang members “lacks the requisite ‘social visibility’ to be considered a particular social group within the meaning of the Act.” In so doing, the BIA did not fully explain its position but cited many of the cases discussed above, including Santos-Lemus v. Mukasey, Matter of E-A-G-, Matter of S-E-G-, and Matter of C-A-. From EA-G-, the BIA derived the principle that the evidence must “establish that members of society, or even gang members themselves, would perceive those opposed to gang membership as members of a social group.”
In denying Henriquez-Rivas asylum because of a lack of “social visibility,” the BIA failed to follow its own precedent as stated in C-A- and its progeny.[13] This *1092 case clearly falls within the language in CA- holding that those who testify against cartel members are socially visible: “[Visibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of cartel members.” 23 I. & N. Dec. at 960 (emphasis added). Here, Henri-quez-Rivas testified in open court against the gang members who killed her father.[14] What is more, Chimbera and Popo were present in the courtroom while Henriquez-Rivas testified. Further, Henriquez-Rivas testified that Chimbera or other supposed MS members came to her home looking for Henriquez-Rivas and her sister. Thus, under the terms of C-A-, the proposed social group of those who testified in court against gang members “involvefs] characteristics that [are] highly visible and recognizable by others in the country in question.” Id. Because of C-A-’s clear language about the “social visibility” of those informants who testify in court, there is no substantial evidence to support the BIA’s conclusion that Henriquez-Ri-vas’ proposed particular social group lacks “social visibility.”
Because the BIA erroneously assumed that the proposed social group was not cognizable under its precedent, it failed to consider significant evidence that Salvadoran society recognizes the unique vulnerability of people who testify against gang members in criminal proceedings, because gang members are likely to target these individuals as a group. See id. at 959 (considering whether the proposed group is “generally easily recognizable and understood by others to constitute [a] social group[]”). Notably, as Henriquez-Rivas cited in her briefing before the BIA as well as in her opening brief on petition for review, the Salvadoran legislature enacted a special witness protection law in 2006 to protect people who testify against violent criminal elements, such as MS, in Salvadoran court. Decreto No. 1029/2006, Ley Especial para la Protección de Víctimas y Testigos [“Special Law for Victim and Witness Protection”], (May 11, 2006).[15] See U.S. Dep’t of State, Country Report on Human Rights Practices: El Salvador at 6 (2006); see also MCA, Inc. v. United States, 685 F.2d 1099, 1103 n. 12 (9th Cir.1982) (noting that this court may take judicial notice of foreign laws under Fed. R.Civ.P. 44.1 if the parties give written notice of their intent to raise an issue of foreign law). It is difficult to imagine better evidence that a society recognizes a particular class of individuals as uniquely vulnerable, because of their group perception by gang members, than that a special witness protection law has been tailored to its characteristics.
Our prior cases denying asylum to those opposed to gangs are distinguishable. Several of our previous cases considered *1093 proposed social groups of those generally opposed to gangs or resistant to gang recruitment. See Santos-Lemus, 542 F.3d at 746; Ramos-Lopez, 563 F.3d at 861. Those cases did not involve the very specific situation of testifying against gang members in court, and considered only generalized opposition to gangs and gang recruitment. The “opposition to gangs” group might not be “socially visible” if the society in question does not perceive those with such views as constituting a distinct group of persons. But for those who have publicly testified against gang members, their “social visibility” is apparent. To the extent that Santos-Lemus, Ramos-Lopez, and related cases mischaracterized the “social visibility” requirement by requiring “on-sight” visibility, they are no longer good law.
It is not clear whether the BIA in this case held that Henriquez-Rivas’ proposed particular social group lacked “particularity.” The BIA merely stated, “defining the group as persons opposing gang members is too amorphous.” This was an incorrect statement of Henriquez-Rivas’ proposed social group, which referred to those who had testified against M-18 gang members in open court, and thus, “can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons.” S-E-G-, 24 I. & N. Dec. at 584. Membership in Henriquez-Rivas’ proposed group can be easily verified — and thus delimited — through court records documenting group members’ testimony. The IJ found Henriquez-Rivas’ testimony credible, and the government does not dispute that Henriquez-Rivas actually testified in court in El Salvador against members of the MS gang.
Our previous cases rejecting as a “particular social group” those acting as government informants are arguably in conflict with our holding today insofar as they require an additional element of shared birth, racial or ethnic origin, or some other innate aspect of homogeneity for the group to qualify as a “particular social group.” In Soriano v. Holder, petitioner contended that he had a well-founded fear of future persecution in the Philippines because he had acted as a police informant against a Filipino criminal gang while living in Los Angeles. 569 F.3d at 1163. We denied his petition for review, thus affirming the BIA’s denial of asylum for lack of “particularity”:
A person who identifies as a “government informant” can be anyone of any demographic description who passes information to government authorities for any purpose. There is no innate characteristic which is so fundamental to the identities or consciences of government informants that identifies them as a particular social group. The purported group, therefore, naturally manifests a plethora of different lifestyles, varying interests, diverse cultures, and contrary political leanings.
Id. at 1166 (internal citation, quotation marks, and brackets omitted); see also Velaseo-Cervantes v. Holder, 593 F.3d 975, 978 (9th Cir.2010) (rejecting a proposed group of former material witnesses for the United States government for lack of “particularity” because “any person of any origin can be involuntarily placed in that role in any type of legal proceeding” (emphasis added)).
These cases reflect the confusion between the “particularity” and “social visibility” requirements. The diversity of “lifestyles” and “origin” to which these cases refer did not concern the “particularity” requirement per se, nor are they relevant to our analysis, as we explain above. Accordingly, to the extent that Soriano and Velaseo-Cervantes make consider *1094 ations of diversity of lifestyle and origin the sine qua non of “particularity” analysis, they are overruled.
Because we grant the petition on the basis that the BIA erred in applying its own precedents in deciding whether Hen-riquez-Rivas was a member of a particular social group, we need not reach the question whether the BIA erred when it failed to consider Henriquez-Rivas’ argument that she was persecuted on account of political opinion. Nor do we reach the issues of withholding of removal or protection under the Convention Against Torture.
The petition for review is GRANTED, the BIA’s decision is VACATED, and the case is REMANDED for further proceedings.

. Matter of Fuentes, 19 I. & N. Dec. 658, 662 (BIA 1988) (noting that, unlike the taxi drivers in Acosta who would have been persecuted only if they continued being taxi drivers who would not cooperate with the persecutors, being a former member of the police was a part of respondent’s past, and was thus an "immutable characteristic, as it [was] one beyond the capacity of the respondent to change”).

. Matter of Toboso-Alfonso, 20 I. & N. Dec. 819, 822 (BIA 1990).

. In re Kasinga, 21 I. & N. Dec. 357, 366 (BIA 1996).

. In re V-T-S-, 21 I. & N. Dec. 792, 798 (BIA 1997) (en banc).

. Prior to Hernandez-Montiel, we used different criteria to determine particular social groups. In Sanchez-Trujillo v. INS, 801 F.2d 1571, 1576 (9th Cir.1986), for instance, we held that particular social groups were defined by voluntary associational relationships.

. Registered homosexuals in Cuba would not necessarily be recognized as such walking down the street. See Toboso-Alfonso, 20 I. & N. Dec. at 822. Former members of the Salvadoran national police would similarly not be recognizable "on-sight.” See Fuentes, 19 I. & N. Dec. at 662.

. We emphasize that to render C-A-’s statements consistent with a proper understanding of "social visibility,” the requirement that an applicant’s conduct has “come to the attention of” his persecutors must not be construed to exclude all conduct that occurs "out • of the public view.” If an applicant can demonstrate as a factual matter that he reasonably fears persecution because some covert action that he has taken may "come to the attention of” his persecutors, then it is irrelevant whether the action would as a general matter not be discovered because of its covert nature.

.We also note that the government has taken the litigation position that "social visibility” does not require "that members of a particular social group must literally be visible to the naked eye.” Br. for Resp’t in Opp'n 12-13, Contreras-Martinez v. Holder, -U.S. -, 130 S.Ct. 3274, 176 L.Ed.2d 1182 (2010).

. In Santos-Lemus, we quoted a BIA decision for the proposition that the particularity requirement looks to "whether the proposed group can accurately be described in a manner sufficiently distinct that the group would be recognized, in the society in question, as a discrete class of persons.” 542 F.3d at 745 (quoting S-E-G-, 24 I. & N. Dec. at 584) (emphasis added) (internal quotation marks omitted). The BIA has also stated that " 'social visibility’ must be considered in the context of the country of concern and the persecution feared,” but it has not specified who in that country or in that society must perceive the petitioner as a member of a particular social group. In re A-M-E & J-G-U-, 24 I. & N. Dec. at 74 (emphasis added).

. See also C-A-, 23 I. & N. Dec. at 960 (denying particular social group status to informants working against the Cali drug cartel, the BIA stated that "[r]ecognizability or visibility is limited to those informants who are discovered because they appear as witnesses or otherwise come to the attention of cartel members.” (emphasis added)).

. In R-A-, the BIA held that the petitioner had not established a nexus between the persecution she suffered and membership in the particular social group: "Guatemalan women who have been involved intimately with Guatemalan male companions, who believe that women are to live under male domination.” 22 I. & N. Dec. at 925, 927. R-A- was later vacated by the Attorney General in anticipation of new rules regarding domestic violence and asylum law. In re R-A-, 22 I. & N. Dec. 906 (A.G. Jan. 19, 2001). However, no final rule was issued, and the case was remanded to the BIA. Nevertheless, litigants and other courts have relied heavily upon its analysis. See, e.g., Valdiviezo-Galdamez, 663 F.3d at 604.

. In Soriano, we rejected petitioner’s proposed particular social group of government *1091 informants against a Filipino gang in the United States. 569 F.3d at 1166.

. While we are aware that the BIA may refine or change its definition of social visibility, it must provide a reasoned explanation for doing so. See F.C.C. v. Fox Television Stations, Inc., 556 U.S. 502, 515, 129 S.Ct. 1800, 173 L.Ed.2d 738 (2009). To date, the BIA has not suggested or held in a published case that its language in C-A- would not be sufficient to establish social visibility for witnesses who are socially visible because they have testified in open court. Rather, its subsequent decisions have focused on people opposed or resistant to gangs and the lack of proven social'visibility. See Matter of S-EG-, 24 I. & N. Dec. at 582 (rejecting Salvadoran youths who resisted gang recruitment, or family members of such Salvadoran youth as a social group, the BIA noted that it was guided by previous decisions holding "membership in a purported social group requires that the group have particular and well-defined boundaries, and that it possess a recognized level of social visibility”); Matter of EA-G-, 24 I. & N. Dec. at 594 (rejecting young Honduran persons who are perceived to be affiliated with gangs and persons resistant to gang membership as members of a particular social group because of the purported group’s failure to establish social visibility that would allow others to identify its members as part of such a group).

. We by no means intend to suggest that the public nature of Henriquez-Rivas’ testimony is essential to her eligibility for asylum. Because Henriquez-Rivas did testify in open court, we need not address whether she would be eligible for asylum if the conduct for which she fears persecution had been less public — for instance, if she had testified behind a protective screen so as to conceal her identity.

. The law states, in pertinent part: "Considering: ... That the current Salvadoran reality evidences the necessity that victims, witnesses and others who are involved in ... judicial proceedings, as well as their families ... should be protected to avoid violations of their rights....” Decreto No. 1029/2006, Ley Especial para la Protección de Victimas y Testigos ["Special Law for Victim and Witness Protection”], (May 11, 2006), at p. 603, available at http://www.ute.gob.sv/cpp/index. php ? option=com_content&task=view&id= 193&Itemid=132. The decree provides for ordinary and extraordinary protection measures, Chapter III, Art. 10 and 11, which include changes of identity and residence, even to foreign countries. Id. at pp. 607-08.