# Matter of H-L-S-A-, Applicant

*Decided January 28, 2021*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

Individuals who cooperate with law enforcement may constitute a valid particular social group under the Immigration and Nationality Act if their cooperation is public in nature, particularly where testimony was given in public court proceedings, and the evidence in the record reflects that the society in question recognizes and provides protection for such cooperation.

FOR APPLICANT: Christina L. Missey, Esquire, Baltimore, Maryland

FOR THE DEPARTMENT OF HOMELAND SECURITY: Lauren M. Taylor, Assistant Chief Counsel

BEFORE: Board Panel: MALPHRUS, Deputy Chief Appellate Immigration Judge; CREPPY, Appellate Immigration Judge; MORRIS, Temporary Appellate Immigration Judge.

MALPHRUS, Deputy Chief Appellate Immigration Judge:

In a decision dated March 5, 2020, an Immigration Judge denied the applicant's applications for withholding of removal under section 241(b)(3)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3)(A) (2018), and withholding of removal pursuant to 8 C.F.R. §§ 1208.16(c) and 1208.18 (2020), the regulations implementing the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). The applicant has appealed from that decision. The appeal will be dismissed.

## I. FACTUAL AND PROCEDURAL HISTORY

The applicant is a native and citizen of El Salvador. On November 1, 2005, he entered the United States without being admitted or paroled and was apprehended and placed in removal proceedings. On June 14, 2006, an Immigration Judge ordered him removed in absentia. On July 9, 2009, the applicant was removed from the United States pursuant to that order.

After returning to El Salvador, the applicant visited his mother-in-law and learned that his wife's cousin had been murdered in that country by members of the MS-13 gang after this cousin refused to pay extortion to the gang. Another of his wife's cousins warned the applicant that MS-13 gang members were looking for him, and his mother-in-law's neighbor warned him that he was not safe in El Salvador. In August 2009, the applicant reentered the United States. On April 1, 2019, he was arrested for illegally reentering this country after being removed.

The applicant was placed in a detention facility in Maryland to await prosecution for illegal reentry. The applicant shared a cell at that facility with a detainee who asked him why he was there, his home country, the location of his family, and what he did for a living. The applicant did not realize at the time that this detainee was a member of the MS-13 gang.

A few days later, the applicant was approached by another detainee who told him he had to pay the MS-13 gang members at the facility $100 for protection. This detainee also told the applicant that detainees who complained about extortion were placed in protective custody. The applicant perceived this to be a warning that the gang knew who was in protective custody and whether anyone reported extortion.

The applicant told this detainee that he could not afford to pay the extortion, but this detainee told him he had no choice if he wanted protection. The applicant also told the detainee with whom he shared a cell that he could not afford to pay, and his cellmate told him that if he did not pay, a member of the gang would stab him. The applicant had heard that his cellmate and other gang members in the facility concealed weapons inside their cells and clothing. The applicant deposited $75 into an account, and the gang did not ask for any additional money.

At the end of May 2019, the applicant's cellmate became upset with one of the officers at the facility. He showed the applicant a weapon concealed within his clothes. The applicant went to the warden of the facility, told him about the weapons and extortion, and asked to be placed in protective custody. The warden advised him the authorities would search the facility, placed the applicant in protective custody, and transferred him to a separate detention facility in Maryland.

A short time later, the applicant was transferred back to the first facility for a hearing on the illegal reentry charge. He was placed in protective custody in that facility. One or two days after his arrival, some gang members shouted at the applicant that he was a "rat" and threatened to kill him. Following this incident, the applicant did not have any further encounters with the MS-13 gang members at the first facility.

The applicant was then transferred back to the second facility, where he did not have any encounters with gang members. Twice someone at that

facility asked him if he was in protective custody, which surprised him because he did not think anyone knew he was in protective custody.

The applicant then met with prosecutors and agents from the Federal Bureau of Investigation ("FBI") to discuss his knowledge of gang activities at the first detention center. The FBI showed the applicant photographs of suspected gang members, and the applicant identified those he knew or suspected to be gang members. The FBI advised him that they would look into the situation and that he would not be sentenced in his illegal reentry case until they had investigated the matter. A week before the applicant was sentenced, the gang members at the first facility were sentenced for various crimes, and the applicant believes that their sentences were lengthened based on what he reported to the FBI and prosecutors.

The applicant had no additional problems with gang members in the United States. However, he fears that if he is returned to El Salvador MS-13 gang members in that country will harm him because the gang members at the first detention facility in Maryland will inform gang members in El Salvador that he cooperated with authorities in the United States. The applicant testified that the gang can find him anywhere in El Salvador and, although local police may protect him for a time, if no one targets him in that country, they will eventually leave him unprotected.

After he was placed in withholding-only proceedings, an Immigration Judge denied the applicant's application for withholding of removal under the Act after finding that he had not shown that there was a clear probability that he would be persecuted based on his membership in a valid particular social group. The Immigration Judge found that the applicant's two proposed social groups—"prosecutorial witnesses" and "long-term residents of the United States"—were not valid for purposes of withholding of removal. The Immigration Judge also found that the applicant had not established a likelihood of torture in El Salvador. The applicant appealed.

## II. ANALYSIS

### A. Withholding of Removal

To establish eligibility for withholding of removal, the applicant must demonstrate that he experienced past persecution, or that there is a clear probability of future persecution, in El Salvador on account of a protected ground, including his membership in a particular social group. *See* section 241(b)(3)(A) of the Act; 8 C.F.R. § 1208.16(b). The Immigration Judge properly denied the applicant's application for withholding of removal

because he did not demonstrate past persecution in El Salvador[1] or a clear probability of future persecution in that country on account of his membership in a valid social group. We agree with the Immigration Judge that the applicant's proposed social group, which is composed of "prosecutorial witnesses," is not valid on this record.[2] Whether this proposed group is cognizable under the Act is a question of law that we review de novo. *See* 8 C.F.R. § 1003.1(d)(3)(ii) (2020); *see also Martinez v. Holder*, 740 F.3d 902, 909 (4th Cir. 2014).

## 1. Particular Social Group

To establish a valid particular social group under the Act, the applicant must demonstrate that his proposed group is "(1) composed of members who share a common immutable characteristic, (2) defined with particularity, and (3) socially distinct within the society in question." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 237 (BIA 2014). It is well settled that victims of crime or those who fear crime are not members of valid social groups. *See id.* at 235; *see also, e.g.*, *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013) (per curiam). These groups do not satisfy the particularity or social distinction requirements. *See Ngugi v. Lynch*, 826 F.3d 1132, 1138 (8th Cir. 2016). Nor does being a witness to a crime, without more, satisfy these requirements. *See id.*

In *Matter of C-A-*, 23 I&N Dec. 951, 961 (BIA 2006), we held that a group composed of confidential informants against a drug cartel was not a valid social group under the Act. In doing so, we specifically distinguished between informants who remain anonymous and those who "appear as witnesses or otherwise come to the attention of cartel members." *Id.* at 960. The proposed social group in *Matter of C-A-* did not include an element of public testimony, and we determined that it lacked social distinction, which, at that time, we referred to as "social visibility." *Id.* at 959–60 ("When considering the visibility of groups of confidential informants, the very nature of the conduct at issue is such that it is generally out of the public

---

[1] The applicant's contention that the threats he received in the Maryland detention facility qualify as past persecution for purposes of withholding of removal is unavailing because "past persecution" must occur in the country of removal. *See* section 101(a)(42) of the Act, 8 U.S.C. § 1101(a)(42) (2018) (defining a "refugee" as a person who cannot avail him or herself of protection in his or her country of nationality because of "persecution" in that country); 8 C.F.R. § 1208.16(b)(1) (2020) (providing that an applicant for withholding of removal must show that he "suffered past persecution in the proposed country of removal").

[2] The applicant does not contest the Immigration Judge's finding that his other proposed group composed of "long-term residents of the United States" is not valid, and we deem the issue waived. *See, e.g.*, *Matter of R-A-M-*, 25 I&N Dec. 657, 658 n.2 (BIA 2012).

view. In the normal course of events, an informant against the . . . cartel intends to remain unknown and undiscovered.").

We also determined that the proposed group was not socially distinct because the record in that case reflected that drug cartels harm "anyone and everyone perceived to have interfered with, or who might present a threat to, their criminal enterprises," and thus "informants are not in a substantially different situation from anyone who has crossed the . . . cartel or who is perceived to be a threat to [its] interests." *Id.* at 960; *see also id.* at 961 (stating that "it is difficult to conclude that any 'group,' as actually perceived by the cartel, is much narrower than the general population of" the country of removal).

The United States Court of Appeals for the Fourth Circuit, in whose jurisdiction this case arises, has not directly addressed the validity of a particular social group composed of prosecutorial witnesses. In *Crespin-Valladares v. Holder*, 632 F.3d 117, 125–26 (4th Cir. 2011), the court held that a particular social group composed of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses against the gangs was valid on the record presented. The court's holding has limited application here, however, because the court's reasoning was based on the nature of the family relationship and the group's "family bonds" and did not address in any significant manner the degree to which testifying in open court affected the particularity and social distinction of the proposed group. *Id.* at 125.

More recently, the Fourth Circuit stated in dicta that "'[p]rosecutorial witnesses' might reach too broad a swath of individuals" to satisfy the particularity requirement. *Temu v. Holder*, 740 F.3d 887, 896 (4th Cir. 2014); *see also Zelaya v. Holder*, 668 F.3d 159, 166–67 (4th Cir. 2012) (stating that "young Honduran males who refuse to join MS-13, have notified the police of MS-13's harassment tactics, and have an identifiable tormentor within the gang" lacks "the self-limiting feature of the family unit, which . . . was critical to our holding in *Crespin-Valladares*").

Other circuit courts have more directly addressed this issue and have recognized that cooperating with law enforcement in a public manner, particularly testifying in public proceedings, is sufficient to establish a valid social group if there is evidence that the society in question recognizes and provides protection for such conduct. The Ninth Circuit, which appears to have the most extensive case law on this issue, has held that a social group composed of persons "who testify against gang members in criminal proceedings" is sufficiently particular and socially distinct to establish a valid social group under the Act. *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013) (en banc). In that case, the applicant testified in open court against the gang members who killed her father, the gang members were

present when she testified, and one of them came to her home looking for her after he was released from prison. The court explained that public testimony against the gangs establishes the requisite particularity of a group composed of "those who had testified against . . . gang members in open court" because membership in this group "can be easily verified—and thus delimited—through court records documenting group members' testimony." *Id.* at 1093 (emphasis omitted).[3]

The court also concluded that the group's social distinction is confirmed by the fact that "the Salvadoran legislature enacted a special witness protection law in 2006 to protect people who testify against violent criminal elements, such as [MS-13], in Salvadoran court." *Id.* at 1092. The court observed, "It is difficult to imagine better evidence that a society recognizes a particular class of individuals as uniquely vulnerable . . . than that a special witness protection law has been tailored to its characteristics." *Id.*

In *Conde Quevedo v. Barr*, 947 F.3d 1238, 1242–43 (9th Cir. 2020), the Ninth Circuit affirmed our conclusion that a social group composed of "[Guatemalans] who report the criminal activity of gangs to the police" was not socially distinct on the record presented. The court noted that the evidentiary record was "devoid of any society specific evidence, such as country reports, background documents, or news articles, which would establish that persons who 'report the criminal activity of gangs to the police' are perceived or recognized as a group by society in Guatemala." *Id.* at 1243.

The court relied heavily on the fact that the applicant was never "called to testify in Guatemala against any gang members," and on that basis the court distinguished its holding in that case from its prior holding in *Henriquez-Rivas*. *Id.* ("The [applicant] in *Henriquez-Rivas* had testified in open court, and the Salvadoran legislature had enacted a special witness protection law to protect those who testify against violent criminals. Here, although [the applicant] reported the attack to the police, there was no evidence that he ever testified against gang members." (citation omitted)).

Noting that "there [was no] evidence that Guatemalans who merely make reports to the police are offered special legal protection," the court concluded that group members must act publicly, not merely make a report to the police, before their group will be considered socially distinct. *Id.* The court stated that "critically, [none of the country conditions reports] assert that Guatemalan society *recognizes* those who, without more, report gang violence as a distinct group." *Id.*

---

[3] We note that evidence of public testimony also corroborates an applicant's group membership.

The public nature of a police report or testimony, while not dispositive, is significant.[4] Although the applicant in *Conde Quevedo* filed a police report, he met alone with a police officer to make this report and only informed his "family and friends" of this report, and there was no evidence that anyone in "the community in general . . . knew that he had filed a report with the police." *Id.* Even though gang members later discovered that he had filed a police report, the court stated that this evidence "shows only individual retaliation, not persecution on account of membership in a distinct social group." *Id.*

In *Diaz-Torres v. Barr*, 963 F.3d 976, 980–81 (9th Cir. 2020), the Ninth Circuit compared its decisions in *Henriquez-Rivas* and *Conde Quevedo*. It concluded that, in the former case, El Salvador's "witness protection law" showed that "Salvadoran society recognizes the unique vulnerability" of the witnesses in this group. *Id.* at 980 (citation omitted). In *Conde Quevedo*, by contrast, the particular social group of people in Guatemala "who report the criminal activity of gangs to police" lacked social distinction because there was no record evidence, including "country reports, background documents, or news articles," showing that those who report gang violence, without taking additional action, "were recognized as a distinct group in Guatemala." *Id.* at 980–81 (citation omitted).

In regards to social distinction, these cases stand for the proposition that there must be evidence that the society in question generally views witnesses as a distinct group before the group will satisfy the social distinction requirement. Thus, it is important to focus on how the relevant society views prosecutorial witnesses. The perspective of the criminals against whom an applicant testified is relevant to the extent that it can be indicative of whether society views the group as distinct, but "the [criminals'] perception is not itself enough to make a group socially distinct." *Matter of M-E-V-G*, 26 I&N Dec. at 242; *see also Cordoba v. Barr*, 962 F.3d 479, 483 (9th Cir. 2020). We also find persuasive the Ninth Circuit's holding that a gang member retaliating against an applicant for merely cooperating with law enforcement only shows individual retaliation, not persecution on account of a protected ground. *See Conde Quevedo*, 947 F.3d at 1243.[5]

---

[4] In *Conde Quevedo* and *Henriquez-Rivas* the Ninth Circuit did not foreclose the possibility that individuals who file a police report, without more, could be members of a valid social group. The court explained that "if there were evidence that, in a specific country, people in the community knew who reported crimes to the police, or if there were laws protecting those who did, the proposed group" may be valid. *Conde Quevedo*, 947 F.3d at 1243.

[5] To establish eligibility for withholding of removal on the basis of membership in a particular social group consisting of prosecutorial witnesses, an applicant must not only demonstrate that this group is valid and he is a member of this group, but also the requisite

The Eighth Circuit has likewise indicated that witnesses to a gang's crimes should provide public testimony against the gang in order to be considered members of a particular and socially distinct group. *See Miranda v. Sessions*, 892 F.3d 940, 943–44 (8th Cir. 2018). In that case, the court affirmed our holding that the social group of "former taxi drivers from [an area in El Salvador] who have witnessed a gang murder" lacks validity because there was no evidence in the record that Salvadoran society recognizes this group as distinct within its society, "particularly since [the applicant] did not testify against any gang members." *Id.* at 943.

In *Ngugi*, 826 F.3d at 1137–38, the court held that the proposed group of "witnesses to criminal activities of the Mungiki," a criminal organization in Kenya, was not valid on the record presented because the applicant had not submitted evidence to support his argument that "merely having seen or experienced crime would satisfy the particularity or social-distinction" requirements, especially since he "presented no evidence that he ever served as a witness against the Mungiki in any public proceedings or, even if he had, that Kenyan society 'recognizes the unique vulnerability of people who testify against gang members in criminal proceedings.'" *Id.* at 1138 (quoting *Henriquez-Rivas*, 707 F.3d at 1091–92).

In a similar vein, the Fifth Circuit held in *Hernandez-De La Cruz v. Lynch*, 819 F.3d 784, 787 (5th Cir. 2016), that a group of "former informants" lacked social distinction because the record in that case reflected that members of this group were "not substantially different from anyone else in the general population who resist[ed] the Zetas or otherwise threaten[ed] their interests." *See also Calel-Chitic v. Holder*, 333 F. App'x. 845, 847–48 (5th Cir. 2009) (per curiam) (holding that a group composed of witnesses to a crime was not valid where the record reflected that gang members threatened anyone who reported them because they did "not want to be caught and convicted").

The Third Circuit has addressed the validity of social groups composed of prosecutorial witnesses, but its approach is somewhat different from these circuits. In two decisions, the court has concluded that in-court testimony

---

nexus between group membership and any persecution—that is, a desire by the persecutor to overcome a characteristic he deems offensive about prosecutorial witnesses. *See Matter of Acosta*, 19 I&N Dec. 211, 222 (BIA 1985) (explaining that harm will only qualify as "persecution" if it is shown that an applicant possessed a "characteristic [the] persecutor sought to overcome"), *modified on other grounds*, *Matter of Mogharrabi*, 19 I&N Dec. 439, 441 (BIA 1987). In this regard, an applicant cannot meet his burden by merely showing that members of a gang sought to punish him for reporting or testifying about their criminal behavior. *See Conde Quevedo*, 947 F.3d at 1243; *cf. Calel-Chitic v. Holder*, 333 F. App'x 845, 848 (5th Cir. 2009) (per curiam) ("Criminal retaliation . . . is not a basis for asylum, and holding otherwise would transform asylum into a garden variety witness protection program." (footnote omitted)).

renders a group of such witnesses sufficiently particular and socially distinct. *See Radiowala v. Att'y Gen. U.S.*, 930 F.3d 577 (3d Cir. 2019); *Garcia v. Att'y Gen. of U.S.*, 665 F.3d 496 (3d Cir. 2011), *as amended* (Jan. 13, 2012). In *Radiowala*, 930 F.3d at 583, the court stated that "a group essentially composed of those who have testified in court has definable boundaries and is equipped with a benchmark for determining who falls within it." The court also found that "the act of testifying . . . lends itself to societal recognition—generally, speaking in open court means that all are readily aware of the group and its members, not just those that are being provided information or potential persecutors who are forever seeking to ferret out informants." *Id.* The court likewise concluded in *Garcia* that an applicant's public testimony against gang members significantly elevated her risk and distinguished her proposed group of individuals who testify against gang members "from cases involving proposed social groups of confidential informants." 665 F.3d at 504 & n.5.

More recently, the court held in *Guzman Orellana v. Att'y Gen. U.S.*, 956 F.3d 171, 180 (3d Cir. 2020), that "a group consisting of witnesses who have publicly provided assistance to law enforcement against major Salvadoran gangs" satisfies all the requirements of a particular social group. In contrast to the public testimony the court found to be critical in *Radiowala* and *Garcia*, the applicant in *Guzman Orellana* was merely seen in public outside his home with a police officer and perceived to be answering questions from the police about a gang-related murder nearby. The cooperation discussed in *Guzman Orellana* differs from the applicant's cooperation in this case, and that decision is not binding here.

We do not agree with the Third Circuit's reasoning in *Guzman Orellana* that in-court testimony "is indistinguishable [from] publicly provid[ing] out of court assistance to law enforcement." *Id.* at 179. As the Third Circuit had previously recognized, testifying in open court significantly elevates an applicant's risk of harm. *Garcia*, 665 F.3d at 504 & n.5. As the court also explained in *Radiowala*, 930 F.3d at 584 n.4, "the persecution faced by informants whose status is assuredly disclosed [by testifying in open court] is markedly different from those who, like many in the public, are merely perceived as, or suspected of, being informants." The fact that the applicant in *Guzman Orellana* was seen talking to the police did not necessarily mean that he cooperated with and provided any assistance to law enforcement to solve a crime. In fact, the applicant in that case did not.

Testifying in court represents a more formal and meaningful degree of cooperation than the conduct at issue in *Guzman Orellana* and is much more easily verifiable. It is significantly more public than the act of simply responding to questions from the police after they initiate contact based on the witness's proximity to a crime scene. Further, testifying in a public

criminal proceeding by formally assisting the legal system and advancing public safety is immutable conduct. In-court testimony also renders a group of witnesses sufficiently particular, in part, because their testimony "can be easily verified—and thus delimited—through court records documenting group members' testimony." *Henriquez-Rivas*, 707 F.3d at 1093. We additionally find persuasive the reasoning of the Ninth and Eighth Circuits that a group composed of prosecutorial witnesses is socially distinct if members of the group have publicly testified, and the record reflects that the society in question recognizes the group as uniquely vulnerable to harm by, for example, enacting legislation or other formal legal protections for testifying witnesses.

The validity of a social group is "a fact-based inquiry made on a case-by-case basis." *Matter of W-Y-C- & H-O-B-*, 27 I&N Dec. 189, 191 (BIA 2018) (citation omitted). Further, the phrase "membership in a particular social group" under section 241(b)(3)(A) of the Act is ambiguous. *Del Carmen Amaya-De Sicaran v. Barr*, 979 F.3d 210, 216 (4th Cir. 2020). Our decision is based on our reasoned consideration and analysis of this phrase in order to promote its consistent application "through a process of case-by-case adjudication." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (citation omitted); *see also INS v. Orlando Ventura*, 537 U.S. 12, 17 (2002). In interpreting the phrase particular social group in this context, we find persuasive the reasoning in the above cases from the Ninth and Eighth Circuits. Consistent with this reasoning, we conclude that cooperation with law enforcement may satisfy the requirements of immutability, particularity, and social distinction and establish a valid particular social group under the Act if the cooperation is public in nature, particularly where testimony was given in public court proceedings, and the evidence in the record reflects that the society in question recognizes and provides protection for such cooperation.

### 2. Application

The Immigration Judge properly found that the applicant had not established that his proposed group of "prosecutorial witnesses" was a valid particular social group on this record. The applicant's proposed group comprises individuals, like himself, who have not testified in any court proceeding. His contention that participating in a photo line-up should be considered "testimonial for the purpose of a prosecution" is not persuasive. It is far from certain that his assistance to law enforcement would have eventually resulted in his public testimony against these gang members. In any event, he did not testify against them, and there was no public aspect to his participation in the photo line-up.

The applicant contends that his assistance to law enforcement presumably became "public" information to the gang members because they referred to him as a "rat" and threatened to kill him. Even if the gang members knew or suspected that he had provided law enforcement with information about them, this "individual retaliation" does not qualify as persecution based on his membership in his proposed group. *Conde Quevedo*, 947 F.3d at 1243.

The applicant also contends that the group "prosecutorial witnesses" has definable boundaries that render it sufficiently particular because it "includes individuals who would have been involved in a criminal prosecution and those who would be the prosecutions' witnesses." However, the applicant does not explain how the phrases "involved in a criminal prosecution" and "the prosecutions' witnesses" are measured in assessing group membership, particularly since neither phrase necessarily involves public testimony.[6]

Under the applicant's broad formulation, a member of his group could have anonymously provided police with a tip but refused to identify himself to the authorities. Similarly, a member of his group could, like the applicant, participate in a photo line-up, without providing further cooperation.

The scope of the applicant's proposed group is also unclear because it appears to encompass not only prosecutorial witnesses in El Salvador and the United States, but also witnesses to prosecutions in every legal forum throughout the world. The applicant argued below that the country in which a group member acts as a "prosecutorial witness" is "irrelevant" to the group's particularity. On the contrary, because the phrase "prosecutorial witnesses" can apply to a prosecution in any jurisdiction in the world, that term is too vague and amorphous to define the group with the requisite particularity.[7] Because the characteristics defining the applicant's proposed group provide no "clear benchmark for determining who falls within the group," it lacks particularity. *Matter of M-E-V-G-*, 26 I&N Dec. at 239.

The record also does not establish that Salvadoran society perceives the applicant's group as a distinct class of persons. *See id.* at 240 ("To be socially distinct, a group . . . must be perceived as a group by society."). Although the applicant cites a Federal indictment from the United States and evidence describing country conditions in El Salvador, these sources do not establish that Salvadoran society perceives his group as distinct. The cited paragraphs in the indictment discuss how MS-13 gang members in Maryland communicate and address individuals suspected of cooperating with law

---

[6] Because the terms defining this proposed group are vague, the Immigration Judge questioned whether the applicant, who did not offer testimony in a criminal proceeding, was even a member of his proposed group.

[7] Further, the jurisdiction in which a group member acts a "prosecutorial witness" is relevant to assessing social distinction.

enforcement. However, the indictment does not discuss or otherwise establish how Salvadoran society perceives "prosecutorial witnesses."

Although the country conditions evidence reflects that El Salvador adopted a law that protects and supports "victims and witnesses of crimes" and "criminal turncoats," it is uncertain whether this law contemplates or protects a "prosecutorial witness" like the applicant, who only participated in a photo line-up in the United States and did not testify or offer evidence publicly. In this regard, the country conditions evidence reflects that the law is intended to protect witnesses who have been targeted by gangs after a "trial judge[] allowed or ordered their identities to be revealed during trial proceedings" in El Salvador. Finally, although the country conditions evidence reflects that the United Nations views "informants, witnesses, and victims of crimes" as members of a particular social group under certain circumstances, this evidence does not speak to how *Salvadoran society* perceives the applicant's proposed group of "prosecutorial witnesses."

Because the applicant has not demonstrated that his proposed social group is sufficiently particular or socially distinct in Salvadoran society, he has not established that there is a clear probability that he will experience persecution in El Salvador on account of a valid particular social group under the Act. We will therefore affirm the Immigration Judge's decision to deny the applicant's application for withholding of removal under section 241(b)(3)(A) of the Act.

## B. Convention Against Torture

The Immigration Judge also properly denied the applicant's application for protection under the Convention Against Torture. The applicant did not experience past torture in El Salvador. *See* 8 C.F.R. § 1208.16(c)(3)(i). He contends that it is more likely than not MS-13 gang members will torture him once he is returned to that country. Specifically, he contends that the gang members in El Salvador will torture him because they will know he informed the authorities in the United States about MS-13 gang members' activities in this country.

However, there is no clear error in the Immigration Judge's finding that his fellow detainees were unaware that he had reported them, and it was insufficiently likely that they would inform gang members in El Salvador about his report, who would then locate him in El Salvador and torture him based on the report he made in the United States. *See Matter of J-F-F-*, 23 I&N Dec. 912, 917 (A.G. 2006) (stating that an applicant for Convention Against Torture protection must establish that each link in a "hypothetical chain of events is more likely than not to happen"); *see also Matter of J-C-H-F-*, 27 I&N Dec. 211, 218 (BIA 2018) (reviewing an Immigration

Judge's predictive findings for clear error).[8]  The applicant testified that he "assumed[]," but did not know, that the other detainees were aware of his report to the authorities.  The applicant also conceded that after he spoke to the FBI, he had no further contact with gang members in either the United States or El Salvador.

The applicant has also not established that a Salvadoran official or an individual acting in an official capacity would consent to or acquiesce in him being tortured by members of MS-13 in that country.  8 C.F.R. § 1208.18(a)(1).  Although country conditions evidence reflects that gang violence, corruption, and impunity remain issues in El Salvador, it also indicates that the Salvadoran Government is taking significant action to address gang violence and corruption in that country.  *See Pacas-Renderos v. Sessions*, 691 F. App'x 796, 805 (4th Cir. 2017) (holding that acquiescence had not been established, even though evidence indicated there was ineffectiveness and corruption among police, where the same evidence showed that the government was making "affirmative efforts to combat gang violence").  Additionally, the applicant conceded that the Salvadoran police would initially protect him upon his return but may leave him unprotected if he remains unharmed.[9]  We will therefore affirm the Immigration Judge's decision to deny the applicant's application for Convention Against Torture protection.[10]  Accordingly, the applicant's appeal is dismissed.

**ORDER:**  The applicant's appeal is dismissed.

**NOTICE:**  If an applicant is subject to a final order of removal and willfully fails or refuses to depart from the United States pursuant to the order, to make timely application in good faith for travel or other documents necessary to depart the United States, or to present himself or herself at the time and place required for removal by the Department of Homeland Security, or conspires to or takes any action designed to prevent or hamper the applicant's departure pursuant to the order of removal, the applicant shall be subject to a civil monetary penalty of up to $813 for each day the applicant is in violation.  *See* Section 274D of the Act, 8 U.S.C. § 1324d (2018); 8 C.F.R. § 280.53(b)(14) (2020).

---

[8]  The record also does not support his claim that it is more likely than not he will be tortured by the gangs because he will be perceived as an outsider or a returnee after a long residence in the United States who is perceived to have money.

[9]  Contrary to the applicant's contentions, the Immigration Judge fully considered the record in this case in assessing whether he had established the requisite acquiescence.  Thus, the decisions he cites, which deal with instances where an Immigration Judge did not fully consider the record, have no bearing on this case.

[10]  Although the applicant asserts that interpretation issues at his individual hearing violated his right to due process, the applicant, who was represented below, did not articulate or advance this issue before the Immigration Judge.  We will not address it in the first instance on appeal.  *See, e.g.*, *Matter of J-Y-C-*, 24 I&N Dec. 260, 261 n.1 (BIA 2007).